**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

CHRISTOPHER O'DELL,

          Plaintiff,

v.                              CIVIL ACTION NO.  3:17-1427

USAA FEDERAL SAVINGS BANK
aka USAA,

          Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendant's Motion for Summary Judgment (ECF No. 23).

Defendant argues that Plaintiff has failed to produce sufficient evidence to permit a reasonable

juror to find in Plaintiff's favor. *Def.'s Mot. for Summ. J.*, ECF No. 23, at 1. Consistent with that

contention, Defendant believes it is entitled to judgment as a matter of law. *Id.* Plaintiff filed his

response to Defendant's motion, in which he counters Defendant's contentions. Having reviewed

the complete briefing on the matter, the Court agrees with Defendant with regard to two of

Plaintiff's counts, but disagrees with regard to the remaining count. Accordingly, and for the

reasons provided below, the Court **GRANTS**, **IN PART**, and **DENIES**, **IN PART**, Defendant's

Motion for Summary Judgment (ECF No. 23).

### I.      Background

Mr. Christopher O'Dell ("Mr. O'Dell" or "Plaintiff") got in trouble with credit card debt.

*Ex. 2 to Def.'s Mot. for Summ. J.*, ECF No. 24-2, at 6-7[1]; *Ex. 1 to Def.'s Mot. for Summ. J.*, ECF

---

[1]    Three of the exhibits filed by the parties overlap: (1) Deposition of Mr. O'Dell (*Ex.*

No. 24-1, at 1. Sometime late in the first decade of the 2000's, Mr. O'Dell opened a credit card

account with USAA Savings Banks[2] (the "USAA Card"). *Ex. 2 to Def.'s Mot. for Summ. J.*, at 5.

Mr. O'Dell did not use the card for extravagant purchases. *Id.* at 16. Instead, he used the USAA

Card for general purchases at the grocery store or drugstore, as well as to pay bills and cover day-

to-day expenses. *Id.* at 5. Despite sensible use of the card, and while simultaneously holding two

jobs, Mr. O'Dell fell behind with payments on the USAA Card. *Id.* 5-7.

In November 2012, faced with mounting debt held by numerous entities, and with an

insufficient income to cover it all, Mr. O'Dell stopped making payments on the USAA Card. *Id.*

at 5-7. By this point, he owed roughly $11,000 on the USAA Card. *Id.* at 5. Mr. O'Dell, who

worked as a janitor when he was not working as a schoolteacher, freely admitted that he owed the

debt. *Id.* at 17. By his own admission, Mr. O'Dell just got "overextended." *Id.* at 5. He, however,

did not expect USAA to merely forgive this accrued debt. *Id.* at 6.

In line with Mr. O'Dell's expectation, USAA did not just call it even and forgive the debt.

Instead, Defendant came calling to collect on that debt. Defendant began a multi-faceted approach

to retrieving the money USAA was owed. In addition to sending letters, Defendant initiated a

regular course of calls to Mr. O'Dell's home, cell, and work numbers in December 2012. *Ex. 1 to*

*2 to Def.'s Mot. for Summ. J.*, ECF No. 23-2; *Ex. 1 to Pl.'s Resp.*, ECF No. 25-1); (2) Defendant's
Call Records (*Ex. 3 to Def.'s Mot. for Summ. J.*, ECF No. 23-3; *Ex. 3 to Pl.'s Resp.*, ECF No. 25-3); and (3) Mr. O'Dell's Call Log (*Ex. 4 to Def.'s Mot. for Summ. J.*, ECF No. 23-4; *Ex. 2 to Pl.'s Resp.*, ECF No. 25-2). When providing citations, and for ease of reference, the Court will only to cite to one of the respective locations at which the information may be found in the exhibits. This choice should not be construed as a comment upon either party's evidentiary production.

[2] Although Mr. O'Dell opened the credit card account with USAA Savings Bank, that entity is not a party to this litigation. USAA Savings Bank assigned the collection activities to one of its affiliates, USAA Federal Savings Bank ("USAA FSB"). *Def.'s Mem. in Supp. of Mot. for Summ. J.*, ECF No. 24, at 2 n.2. As such, references to "Defendant" only refer to USAA FSB. References to "USAA" refer to either USAA Savings Bank or USAA FSB, or both, depending upon the context. However, reference to "USAA" does not imply any liability on the part of USAA Savings Bank.

*Def.'s Mot. for Summ. J.*, at 1; *Ex. 2 to Def.'s Mot. for Summ. J.*, at 7-10; *see generally Ex. 3 to Def.'s Mot. for Summ. J.*, ECF No. 23-3; *Ex. 4 to Def.'s Mot. for Summ. J.*, ECF No. 23-4.

Around the same time that Mr. O'Dell stopped making payments and Defendant started making calls, Mr. O'Dell sought the assistance of a lawyer. *Ex. 2 to Def.'s Mot. for Summ. J.*, at 7. Mr. O'Dell felt overwhelmed by the calls, as well as the pressure to pay the debt, and he needed help. *Id.* at 7-8, 10, 14. His attorney provided him with a strategy for documenting the calls that Mr. O'Dell received. *Id.* at 8. Additionally, Mr. O'Dell's lawyer provided him with a script that he was to read upon answering one of Defendant's calls. *Id.* at 10. The script read as follows: "PLEASE DON'T CONTACT ME ANYMORE IT MAKES ME NERVOUS. SCOTT STAPLETON OF HUNTINGTON, WEST VIRGINIA IS MY LAWYER." *Ex. 4 to Def.'s Mot. for Summ. J.*, at 1 (capitalization original). According to Mr. O'Dell, he read this script on January 23, 2013, then hung up. *Id.*; *Ex. 2 to Def.'s Mot. for Summ. J.*, at 11-12. After reading this script, Mr. O'Dell stopped answering Defendant's calls. *Ex. 2 to Def.'s Mot. for Summ. J.*, at 11-12.

Defendant's call records fail to reflect this attorney notification. *See generally Ex. 3 to Def.'s Mot. for Summ. J.* However, Defendant's records do reflect that Mr. O'Dell provided notification that he had legal representation. Only, Defendant's records show that Mr. O'Dell first mentioned retaining a lawyer *before*, not after, January 23, 2013. *Compare Ex. 3 to Def.'s Mot. for Summ. J.*, at 57 (showing the acknowledgment that Mr. O'Dell had told Defendant's representative that he was represented by an attorney) *with Ex. 2 to Def.'s Mot. for Summ. J.*, at 11-12 (explaining that Mr. O'Dell does not recall notifying Defendant of his representation before January 23, 2013).

According to Defendant's call records, on December 31, 2012, Defendant's call center received an incoming call.[3] *Ex. 3 to Def.'s Mot. for Summ. J.*, at 57. During the course of this call,

---

[3] As an aside, the Court finds Defendant's call records to be cryptic and confusing.

Mr. O'Dell appears to have notified Defendant that he was represented by an attorney. *Id.* But, according to Defendant's record of the conversation, Mr. O'Dell could not recall specific information regarding his attorney at the time. *Id.*; *Ex. 2 to Def.'s Mot. for Summ. J.*, at 12. Further, the note in Defendant's call logs indicates that Defendant's representative told Mr. O'Dell that he would remain in their system until he provided more information regarding his attorney. But the representative instructed him to call back to provide the information when he had it available. *Id.*

---

Largely written in unexplained abbreviations and code, the call records do not help the Court to understand basic and essential information about Defendant's calling practices. For instance, Defendant's call records reflect that a vast majority of the call attempts appear to have been placed between 2:30 a.m. and 4:30 a.m. *See generally Ex. 3 to Def.'s Mot. for Summ. J.* Even if the Court were to assume that this timestamp reflects an adjustment for the time-zone difference between where the calls were placed, and where they were received by Mr. O'Dell, this timestamp does not make sense. The Court could only identify one call that appears to have been made *post meridiem* (p.m.). *Id.* at 60. Mr. O'Dell, however, reports that he regularly received calls from around 9:00 a.m. to 8:30 p.m. *See Ex. 4 to Def.'s Mot. for Summ. J.* Defendant's call records do not appear to reflect a similar 12-hour time-range for calls. Moreover, even if the timestamp did indicate an adjustment for time-zone difference, given the nearly 12-hour period that Plaintiff received calls, the Court would expect more than *one* call with a "p.m." indication. This is just one of the peculiarities contained within Defendant's call records.

Generally, if a party is going to submit its own records to support its position regarding summary judgment, the Court expects the parties to explain the documents where their meaning is not readily decipherable on their face. Without some sort of legend, key, or cypher, Defendant's call records make little sense. Furthermore, the Court cannot rely upon any generally acceptable point of reference to discern the inputs and codes found on Defendant's call records. Faced with a largely incomprehensible set of documents, the Court must either guess at the meaning of aspects of the records, or ignore all but those portions of the records that have a minimum resemblance to common English.

Defendant has submitted its call records to support its position that the only reasonable interpretation of the undisputed evidence falls in its favor. But due to Defendant's shorthand or code, the Court cannot extract a large portion of the meaning that these records supposedly contain. The Court is certain that Defendant's representatives could look at these records and glean all manner of helpful nuggets of information. However, without the benefit of that expertise and entrenched corporate training, the Court cannot do the same. In order to fulfill its duty as an objective, fair, and reasonable adjudicating body, the Court must have, at the very least, a minimal appreciation for the information contained within submitted documents. Where unclear to the untrained eye, the parties and their counsel must fill in the gaps to comprehension, and provide the Court with instruction on how to read a party's cryptic documents.

Mr. O'Dell, however, did not recall this conversation. *Ex. 2 to Def.'s Mot. for Summ. J.*, at 12. During Mr. O'Dell's deposition, Defendant's counsel asked him whether he had notified Defendant regarding his hiring of an attorney prior to January 23, 2013. *Id.* Mr. O'Dell responded that he had not. Defendant's counsel read to Mr. O'Dell the interpretation of Defendant's notes from that December 31, 2012 call.[4] *Id.* Even after this prompt, Mr. O'Dell did not recall this conversation taking place. *Id.* Additionally, Mr. O'Dell clarified that this alleged conversation on December 31, 2012 could not have been the same one that he noted on January 23, 2013.

Regardless of the date on which Mr. O'Dell first notified Defendant that he had retained an attorney, Defendant continued to call him dozens and dozens of times. Mr. O'Dell's call log shows 183 calls from Defendant within a four-month period. *See id.* at 8, 12; *See generally Ex. 4 to Def.'s Mot. for Summ. J.* Although Defendant's representatives did not abuse Mr. O'Dell verbally in the calls, the incessant calling made Mr. O'Dell very nervous. *Id.* at 10, 13-14.

In an effort to remedy what Mr. O'Dell believed was "harassment," he filed the complaint in this action. *Id.* at 4. Originally, Mr. O'Dell's attorney filed the complaint in the Circuit Court of Mason County, West Virginia. *Notice of Removal*, ECF No. 1. However, Defendant timely removed the action to this Court. *Id.*

---

[4] During the deposition, Defendant's counsel qualified her reading of the notes: "And I know these are in abbreviations, but I will try to read through this with you as best as I can." *Ex. 2 to Def.'s Mot. for Summ. J.*, at 12. Her difficulty interpreting the notes is understandable. The notes read as follows: "PHC ADV HE IS REP BY ATRNY FOR BK – MBR DID NOT HAVE ATRNY INFO AT TIME OF CALL – EXPL TO MBR WILL KEEP IN CALL SYSTEM UNTIL ATNRY INFO UPDATED AND IF MBR CAN PLEASE CALL BACK WHEN HE HAS THE INFO ALSO." *Ex. 3 to Def.'s Mot. for Summ. J.*, at 57 (capitalization original). As the court noted above, *supra* note 3, Defendant's call records are largely incomprehensible due to the ubiquity of code, abbreviations, and jargon. Sadly, the notes read by Defendant's counsel regarding the alleged conversation taking place on December 31, 2012 are among the most readily intelligible information contained within Defendant's call records.

In his complaint, Mr. O'Dell asserts three counts: (1) Violations of the West Virginia Consumer Credit and Protection Act ("WVCCPA"); (2) Intentional Infliction of Emotional Distress ("IIED"); and (3) Common Law Invasion of Privacy. *Compl.*, ECF No. 1-1, ₱ 11-22. He also requests relief in the form of appropriate statutory, compensatory, and punitive damages. *Id.* at 7-8. Defendant contends that summary judgment is appropriate in its favor for each of Mr. O'Dell's claims.

As explained below, the Court believes summary judgment is appropriate in Defendant's favor with regard to Counts II and III, alleging claims of IIED and Common Law Invasion of Privacy, respectively. However, because there remain genuine issues of material fact, the Court must permit certain aspects of Mr. O'Dell's Count I, stating claims under the sections 46A-2-128(e) & 46A-2-125(d) of the WVCCPA, to continue.

## II. Legal Standard

To obtain summary judgment, the moving party must show that no genuine issue as to any material fact remains and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those that might affect the outcome of a case, and a "genuine issue" exists when a reasonable jury could find for the nonmoving party upon the evidence presented. *The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). So too, it is not the province of the Court to make determinations of credibility. *Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir. 1991). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 587-88 (1986). Any inference, however, "must fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture." *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001) (citation omitted).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, in order to survive summary judgment, the nonmoving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and, after adequate time for discovery, does not make a showing sufficient to establish that element. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252. "Mere speculation by the non-movant cannot create a genuine issue of material fact" to avoid summary judgment. *JKC Holding Co.*, 264 F.3d at 465.

### III.    Discussion

Because Defendant argues for summary judgment on each of Mr. O'Dell's claims, the Court will review each claims, and the parties' respective arguments, in turn.

### a.    Count I: WVCCPA Claims

Count I of Mr. O'Dell's Complaint alleges violations under multiple sections of the WVCCPA. The WVCCPA is a comprehensive consumer protection code that provides private causes of action for aggrieved debtors against debt collectors. *See Bourne v. Mapother & Mapother, P.S.C.*, 998 F.Supp.2d 495, 500-01 (S.D.W. Va. 2014) (citation omitted). As a general matter, the Supreme Court of Appeals of West Virginia ("West Virginia Supreme Court") has instructed that courts applying the WVCCPA should construe the statute broadly and liberally. *See*

*id.* (citing *State ex rel. McGraw v. Scott Runyan Pontiac-Buick, Inc.*, 461 S.E.2d 516, 523 (W. Va. 1995)). To that end, when considering the WVCCPA, courts should give effect to the purposes intended by the legislature. *Id.* at 501.

Mr. O'Dell puts forward three claims that rely upon sections of the WVCCPA: (1) one under W. Va. Code § 46A-2-128(e); (2) one under W. Va. Code § 46A-2-125; and (3) one under W. Va. Code § 46A-2-125(d). *See Compl.* at ¶ 12. In its motion, Defendant contests that summary judgment on each of these claims is appropriate.

With respect to Mr. O'Dell's claims under section 46A-2-125 and section 46A-2-125, Defendant argues that Plaintiff cannot maintain a claim under the umbrella provision of 46A-2-125 that is separate from his 46A-2-125(d) claim. The Court need not reach a decision with regard to that question. In his response, Plaintiff failed to respond to Defendant's contention that the claim under the umbrella section, 46A-2-125, should be dismissed. As such, Plaintiff has produced no evidence to support a potential claim under the umbrella provision. Therefore, the Court agrees with Defendant. However, because the Court will permit Mr. O'Dell's claim to continue under the subsection, 46A-2-125(d), the Court will merely construe Mr. O'Dell's citation to the umbrella section 46A-2-125 as superfluous. The Court will combine the second and third claims under WVCCPA, and appropriately analyze the claim under the relevant framework applicable to subsection 46A-2-125(d).

### i. Claim under W. Va. Code § 46A-2-128(e)

Returning to Mr. O'Dell's first claim under the WVCCPA, Mr. O'Dell claims that Defendant violated section 46A-2-128(e). That section prohibits "[a]ny communication with a consumer whenever it appears that the consumer is represented by an attorney and the attorney's name and address are known, or could be easily ascertained." W. Va. Code § 46A-2-128(e)

(2013)[5]. A debt collector does not violate the provision if the communication occurs after "the attorney fails to answer correspondence, return phone calls or discuss the obligation in question." *Id.*

Defendant contends that Mr. O'Dell's 46A-1-128(e) claim must fail because he has not presented sufficient evidence that "his attorney's name was known to [Defendant] or could [have been] easily ascertained." *Def. Mem. in Supp. of Mot. for Summ. J.*, at 6. Defendant conceded that Plaintiff testified at his deposition that he read the script with the name of his attorney, Scott Stapleton, to Defendant's representative. *Id.* However, Defendant argues "there is no evidence that [Defendant] had knowledge of Mr. Stapleton's name or that it could easily ascertain [it]." *Id.* To support its view, Defendant advances a two-buttress argument, one legal and one factual.

On the legal front, Defendant claims that Mr. O'Dell's evidence that he merely read the script is inadequate to support his claim. Defendant implores that the "statutory requirement is not that the name be *provided* to the debt collector – it is that the name be *known* to the debt collector (or that it could be easily ascertained)." *Id.* (italics and parenthetical original). And, according to Defendant, Plaintiff has only demonstrated that he said Mr. Stapleton's name, and the city where he could be found. However, says Defendant, Plaintiff has not demonstrated that Defendant's representative "actually heard and knew Mr. Stapleton's name." *Id.* Based upon this argument, Defendant asserts that only speculation supports Plaintiff's required showing that Defendant

---

[5] Note that this version of the code ceased to be effective on June 11, 2015. Since then, the section has been amended twice. The first change became effective on June 12, 2015, and ceased its effectiveness on July 3, 2017. This version specifically required written notice to a debt collector of attorney representation. W. Va. Code § 46A-2-128(e) (2015). On July 4, 2017, the effective section changed again. In its current form, section 46A-2-128(e) not only requires written notice, but the written notice must now be delivered to the debt collector via certified mail. W. Va. Code § 46A-2-128(e) (2018).

"heard and knew" Mr. Stapleton's name. *Id.* at 6-7. In the vacuum of evidence, Defendant argues that the claim must fail.

With regard to its factual contentions, Defendant bolster's its legal argument by suggesting *possible*, alternative factual scenarios. These scenarios, however, are unsupported by even the most tangentially relevant evidence. Defendant suggests that Mr. O'Dell "may have mumbled, talked too fast, or the connection could have cut out, among other potential issues." *Id.* at 6. Additionally, in a footnote, Defendant's counsel provides a hypothesis for how Mr. O'Dell's words might not have been properly understood by the call representative. Defendant's counsel proffers this possibility: "the representative believed he or she heard 'Scott Staples' rather than 'Scott Stapleton.'" *Id.* at 6 n.3. This hypothesis, of course, finds no genesis in anything found in the factual record. To be clear, no deposition testimony, document, or record suggests any of these issues. Indeed, this appears to be a fictitious version of a possible occurrence, created by Defendant's counsel.[6] The Court cannot accept baseless suppositions to support a grant of summary judgment.

On summary judgment, the Court must draw any permissible inference in favor of the nonmoving party, Mr. O'Dell. In this case, the Court finds it reasonable to infer from Plaintiff's concrete evidentiary showing, that Defendant's representative heard Mr. O'Dell when he read his script over the phone. To the extent that this is not the case, the parties genuinely dispute an issue of material fact: Did Mr. O'Dell's words audibly and intelligibly make their way to the Defendant's

---

[6] The hypothetical footnote continues. As with any diligent application of the scientific method, a hypothesis must be tested to determine its validity. Indeed, Defendant's counsel tested the hypothesis that the representative heard "Scott Staples" instead of "Scott Stapleton." *Def.'s Mem. in Supp. of Mot. for Summ. J.*, at 6 n.3. Her results: a Google search returned a different law firm than Mr. Stapleton's, when "Scott Staples" was searched. *Id.* Not resting with just one test variance, counsel also tested a search of "Scott Staples Huntington, WV attorney." But again, the search was fruitless. *Id.*

representative on the other end of the telephone line? Whether or not Defendant's representative heard Mr. O'Dell's recitation of his lawyer's name and city would likely affect the ultimate determination of his claim under 46A-2-128(e). Where the parties dispute an issue of material fact, summary judgment is inappropriate. *See Anderson*, 477 U.S. at 248 (providing that summary judgment "will not lie" if there is a genuine dispute over a material fact).

Additionally, Defendant contends that even assuming that the call representative clearly heard Mr. O'Dell, the information read from the script is insufficient to support a 46A-2-128(e) claim. Defendant cites to the portion of that provision that requires the attorney's name and address be known, or easily ascertained. *Def.'s Mem. in Supp. of Mot. for Summ. J.*, at 7. Because Mr. O'Dell failed to provide an address, Defendant argues his notification was deficient under the parameters of the section. The Court disagrees.

Consistent with the reasonable inference that Mr. O'Dell's words were heard and understood, the Court finds that Mr. Stapleton's address could have been "easily ascertained." Plaintiff submitted with his response an exhibit depicting an internet search. The entry of "scott stapleton of huntington, West Virginia [sic throughout]" returned a panoply of links and information about Mr. Stapleton's firm, including his address. *Ex. 5 to Pl.'s Resp.*, ECF No. 25-5. Based upon this showing, and common sense, the Court finds the information contained within Mr. O'Dell's script would permit a debt collector to easily ascertain Mr. Stapleton's address. Therefore, Mr. O'Dell's claim under section 46A-2-128(e) will continue.

### ii. Claim under W. Va. Code § 46A-2-125(d)

Defendant similarly challenges Plaintiff's claim under section 46A-2-125. That section prohibits debt collectors from "unreasonably oppress[ing] or abus[ing] any person in connection with the collection of or attempt to collect any claim alleged to be due and owing by that person

or another." W. Va. Code § 46A-2-125. At the time of the conduct at issue here, subsection (d) of the provision, under which Plaintiff brings his claim, established a standard for determining whether conduct was "unreasonably oppressive and abusive." The debt collector violated section 46A-2-125(d) if it "caus[ed] a telephone to ring or engag[ed] any person in telephone conversation repeatedly or continuously, or at unusual times or at times known to be inconvenient, with intent to annoy, abuse, oppress or threaten any person at the called number." W. Va. Code § 46A-2-125(d) (2013).[7] Defendant, however, contends that this version of the section does not apply.

Instead, Defendant argues that the amended version of section 46A-2-125(d) applies to this case. Effective as of June 12, 2015, the current version of the subsection provides a two prong standard to determine whether a debt collector has violated the provision. *See* W. Va. Code § 46A-2-125(d) (2018). A debt collector violates the section if it calls

> [(1)] any person more than thirty time per week or engag[es] any person in telephone conversation more than ten times per week, or at unusual times or at times known to be inconvenient, [(2)] with intent to annoy, abuse, oppress or threaten any person at the called number.

*Id.* Thus, a plaintiff must satisfy the first prong by establishing the threshold of the quality or nature of violative conduct (the "threshold element"), then a plaintiff may demonstrate the intent behind the conduct (the "intent element"). *Huffman v. Branch Banking & Trust Co.*, No. 3:16-8637, 2017 WL 2177351, at *4 (S.D.W. Va. May 17, 2017) (Chambers, J.) (describing the amendment to the statute, and providing that the initial threshold element must be met before a jury can consider the intent element). Plaintiff must demonstrate the required call threshold before he would be permitted to continue with his claim. *Id.* at *4-5. This threshold prong substantially differs from

---

[7] This version of the code remained effective until June 11, 2015.

the prior version of subsection (d), which was effective at the time Defendant allegedly called Mr. O'Dell in violation of the WVCCPA.

Despite the fact that the amended version of 46A-2-125(d) did not take effect until over two years after Defendant placed the calls at the heart of this suit, Defendant argues it applies. Defendant balances its entire argument upon the wobbly support afforded by a footnote in a recent opinion by the West Virginia Supreme Court. *Def.'s Mem. in Supp. of Mot. for Summ. J.*, at 8-10. In *Valentine & Kebartas, Inc. v. Lenahan*, the West Virginia Supreme Court reviewed, as a matter of first impression, whether a volume of calls by a debt collector could, absent any other evidence, establish the intent prong under section 46A-2-125(d). 801 S.E.2d 431, 432 (W. Va. 2017). Ultimately, the Court said that a plaintiff must produce some other evidence, in addition to call volume, in order to satisfy the intent prong. *Id.* at 436-37.

In construing the dictates of the intent requirement under the statute, the West Virginia Supreme Court clarified that it was analyzing the old version of the subsection. *Id.* 434 n.8. It did so by dropping a footnote. The footnote acknowledged both that the statute had been amended in 2015, and that the amended version was effective at the time of the Court's decision. *Id.* After providing the new language, the West Virginia Supreme Court stated as follows:

> We decline to consider this amendment because it was not in effect as of the date of the bench trial in this matter. All subsequent references to West Virginia Code 46A-2-125 shall be to the version in effect at the time of the bench trial in this case, which was promulgated in 1974.

*Id.* The Court then proceeded with its analysis regarding the lower court's determination that call volume alone could substantiate the intent requirement under the old version of 46A-2-125(d).

Defendant contends that this footnote makes it "clear" that a court must apply the version of 46-2-125(d) "in effect at the time of trial." *Def.'s Mem. in Supp. of Mot. for Summ. J.*, at 9

(citing *Valentine*, 801 S.E.2d at 434 n.8). As such, Defendant urges this Court to apply the amended version of the statute to Plaintiff's claim, which arose prior to the amended statute's enactment. Although Defendant's argument drips of legal creativity, its augment lacks the necessary legal footing. The Court will not effect retroactive application of a statute by relying upon the footnote in *Valentine*.

As Plaintiff correctly notes in his opposition to Defendant's inventive argument, "retroactivity is not favored in the law." *See Pl.'s Resp.*, at 6-7 (internal quotation marks omitted) (quoting *Landgraf v. USI Films Prods.*, 511 U.S. 244, 264 (1994)). Although this "antiretroactivity principle" emanates from various Constitutional provisions, it harkens back to legal thinking that predates the Republic. *See id.* at 266 (explaining how the idea has roots in both prior legal doctrines and the *Ex Post Facto*, Takings, and Due Process Clauses of the Constitution). That citizens should generally receive "fair warning" regarding the law underlies the continued emphasis upon the principle.

Echoing this idea, West Virginia solidified the "antiretoractivity principle" in its Code. "A statute is presumed to be prospective in its operation unless expressly made retrospective." W. Va. Code § 2-2-10(bb). In order for a statute to apply retroactively, it must appear "by clear, strong[,] and imperative words or by necessary implication, that the Legislature intended to give the statute retroactive force and effect." *Martinez v. Asplundh Tree Expert*, 803 S.E.2d 582, 586 (W. Va. 2017) (internal quotation marks and citaiton omitted) (quoting Syl. pt. 2, *In re Petition for Attorney Fees and Costs: Cassella v. Mylan Pharm., Inc.*, 766 S.E.2d 432 (2014)). And although procedural statutory amendments may be allowed retroactive application, if a statute "diminishes substantive rights or augments substantive liabilities[, it] should not be applied retroactively to events completed before the effective date of the statute . . . unless the statute provides explicitly for

retroactive application." *Id.* at 586-87 (internal quotation marks omitted) (quoting Syl. pt. 2, *Pub. Citizen, Inc. v. First Nat. Bank in Fairmont*, 480 S.E.2d 538 (W. Va. 1996)).

This District has already analyzed whether the 2015 amendments to the WVCCPA apply to events which occurred prior to their effective date. In *Biser v. Mfrs. & Traders Tr. Co.*, Judge Burger noted that the West Virginia Legislature did not expressly direct retroactive application of the 2015 WVCCPA amendments. 211 F.Supp.3d 845, 853 (S.D.W. Va. 2016). Moreover, Judge Burger found that retroactive enforcement of the statute's changes would "substantively alter the legal implications of events completed prior to the amendment's effective date." *Id.* Based upon this finding, Judge Burger considered the Legislature's attempt to classify the amendments as a "clarification" to be unavailing. *See id.* 853-54. Although the pre-2015 version of the WVCCPA broadly stated what constituted violative conduct, the statement was clear. *Id.* at 853. In light of the "antiretroactivity principle," the standards for determining retroactive application, and the language of the 2015 WVCCPA amendments, as well as the original version of the statute, Judge Burger concluded that the amendments would only apply prospectively. *Id.* at 854.

The Court does not believe that footnote eight of *Valentine* alters the correctness of Judge Burger's analysis, or conclusion. As emphasized in the discussion about the standards for retroactive application, clarity of retroactivity is paramount. Despite the Defendant's contentions, the *Valentine* footnote does not clearly state a change in the WVCCPA's retroactive application. Defendant did not cite to any case, nor could the Court identify a case, where a court applied the 2015 WVCCPA amendments to events that occurred prior to their effectiveness. *See Def.'s Mem. in Supp. of Mot. for Summ. J.*, at 8-10; *Def.'s Reply*, ECF No. 26, at 7-9. Indeed, in *Valentine*, the West Virginia Supreme Court did not apply the 2015 WVCCPA amendments retroactively. Although the footnote in *Valentine* may be loosely phrased, the Court believes the footnote's main

premise parallels Judge Burger's conclusion in *Biser*, as well as the Court's conclusion in this case. In essence, the *Valentine* footnote explained that the West Virginia Supreme Court would not consider the 2015 WVCCPA amendments because they would not be applied to a scenario that predated their effectiveness. *See Valentine*, 801 S.E.2d at 434 n.8. Consistent with that, the Court will not apply the 2015 WVCCPA amendments to the facts of this case, which occurred prior to June 12, 2015.

Analyzing Mr. O'Dell's claim under the version of 46A-2-125(d) effective at the time of the calls in question, the Court finds he has met his burden to survive summary judgment. In order to violate the old version of 46A-2-125(d), a debt collector must "caus[e] the telephone to ring or engag[e] any person in telephone conversation repeatedly or continuously . . . with the intent to annoy, abuse, oppress or threaten any person at the called number." W. Va. 46A-2-125(d) (2013). Mr. O'Dell's call log satisfies the required showing to establish "repeated or continuous" calling at the summary judgment stage. Mr. O'Dell has submitted evidence of roughly 180 calls over a four-month period. *See generally Ex. 2 to Pl.'s Resp.*, ECF No. 25-2. But Defendant's call records appear to reflect fewer calls. *See generally Ex. 3 to Def.'s Mot. for Summ. J.*. To the extent that the parties' respective call information differs, the parties have demonstrated that they dispute a material issue of fact regarding whether the calls were "repeated or continuous." With this dispute over material fact, summary judgment is improper. This, however, is the first of a two-part required showing for the 46A-2-125(d) claim to continue.

Mr. O'Dell has likewise produced sufficient evidence to meet his burden regarding the intent prong of the 46A-2-125(d) claim. In *Valentine*, the West Virginia Supreme Court concluded that a volume of 211 calls over eight months was insufficient to establish the intent prong of 46A-2-125(d) as a matter of law. *Valentine*, 801 S.E.2d at 436 ("We similarly find that the volume of

unanswered calls in this case does not establish intent in violation of [the section].”). Without other evidence, said the Court, the plaintiff's evidence of 211 calls was not enough. Fortunately for Mr. O'Dell, he has presented additional evidence supporting the intent prong, and has met the standard announced in *Valentine*.

In addition to establishing the 183 calls over a four-month period, Mr. O'Dell has produced sufficient evidence to illustrate a disputed issue of material fact regarding the intent of the calls. Beyond the volume, Mr. O'Dell has produced evidence about the quality and characteristics of the calls from which a reasonable juror could find that Defendant intended to, at the very least, annoy him. As reported by Mr. O'Dell, Defendant did not just call his home and cell phones. *Ex. 1 to Pl.'s Resp.*, at 10. Instead, it apparently called his place of work, leaving messages with Mr. O'Dell's co-workers. *Id.* Additionally, Mr. O'Dell, in reading his script to Defendant's representative, communicated three meaningful messages.

First, Mr. O'Dell requested that Defendant stop calling. *Ex. 2 to Pl.'s Resp.*, at 1. Unlike in the *Valentine* case, Mr. O'Dell had answered Defendant's calls on multiple occasions. *Ex. 1 to Pl.'s Resp.*, ECF No. 25-1, at 10-11. The *Valentine* court seized upon the plaintiff's refusal to answer the calls in that case. *See Valentine*, 801 S.E.2d at 437-38. The Court said that answering would have been a basic step that the plaintiff could have taken to abate the calls. *Id.* Here, Mr. O'Dell had a history of answering Defendant's calls. And when the calls became oppressive, Mr. O'Dell requested that Defendant stop calling. *Ex. 1 to Pl.'s Resp.*, at 10. Therefore, Defendant had notice of Mr. O'Dell's desire to have the calls cease. But Defendant disregarded Mr. O'Dell's request, and did so over 180 times, in a four-month span. Mr. O'Dell's notification, and Defendant's subsequent contrary actions, militates in favor of establishing an intent to annoy, at the very least.

Second, Mr. O'Dell conveyed to Defendant the deleterious effect its continued calls had upon him. Mr. O'Dell told Defendant that the calls made him "nervous." *Ex. 2 to Pl.'s Resp.*, at 1. In *Valentine*, the plaintiff had not provided the defendant with any knowledge of the effect the calls had upon him. *See Valentine*, 801 S.E.2d at 437-38. Yet in this case, Mr. O'Dell notified Defendant that its continued calls were injurious. In spite of this knowledge, Defendant continued to call, over and over again. A reasonable juror could certainly find that repetitive and continuous calls to an individual, after he or she has notified a debt collector that its calls were negatively affecting him or her, would indicate an intent to annoy, abuse, or oppress.

Third, Mr. O'Dell represented to Defendant that he had retained an attorney, and provided the name and location of his attorney. *Ex. 2 to Pl.'s Resp.*, at 1. Defendant, however, made all of the relevant calls after Mr. O'Dell notified Defendant that he had counsel. *See generally id.* This, yet again, differentiates the facts of this case from those in *Valentine*. In *Valentine*, only one or two calls, of the roughly 200 attempted, were made after the plaintiff had notified the defendant that he had hired a lawyer. *Valentine*, 801 S.E.2d at 433 n.4. However, the 46A-2-128(e) claims had not been addressed by the trial court, and were thus not considered by the West Virginia Supreme Court. *Id.* But in this case, of the 183 calls made, all of them were made after Mr. O'Dell had supposedly notified Defendant that he had retained Mr. Stapleton. Although conduct violative of 46A-2-128(e) does not *per se* violate 46A-2-125(d), it certainly supports the reasonable conclusion that, when combined with the other considerations, Defendant acted with the culpable intent under 46A-2-125(d). *See Biser*, 211 F.Supp.3d at 856 ("The Court declines to adopt the [plaintiffs'] position that calls placed after notice of an attorney constitute a *per se* violation of §125 as well as §128(e).").

The record demonstrates that Mr. O'Dell has presented more than just the mere volume of calls to establish Defendant's intent. Mr. O'Dell has produced evidence regarding the volume, the nature, the quality, and the characteristics of Defendant's repeated and continuous calls. As such, Mr. O'Dell has complied with the dictates of the West Virginia Supreme Court's decision in *Valentine*. As illustrated above, Defendant's insistent and multi-faceted focus upon *Valentine* to support its arguments misses the mark.

As other courts in this District have instructed, when considering whether a debt collector has engaged in unreasonably oppressive or abusive conduct, a jury may consider the totality of circumstances. *See Biser*, 211 F.Supp.3d at 856. The Court will let the jury consider the totality in this case. Mr. O'Dell's claim under 46A-2-125(d) survives summary judgment.

### b. Count II: IIED Claim

Count II of Mr. O'Dell's Complaint alleges that Defendant's conduct constituted a intentional infliction of emotional distress ("IIED"). Under West Virginia law, a plaintiff must establish four elements to maintain an IIED claim. The plaintiff must show:

> (1) conduct by the defendant which is atrocious, utterly intolerable in a civilized community, and so extreme and outrageous as to exceed all possible bounds of decency; (2) the defendant acted with intent to inflict emotional distress or acted recklessly when it was certain or substantially certain such distress would result from his conduct; (3) the actions of the defendant caused the plaintiff to suffer emotional distress; and (4) the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

*Travis v. Alcon Labs. Inc.*, 504 S.E.2d 419, 425 (W. Va. 1998) (quoting *Hines v. Hills Dept. Stores, Inc.*, 454 S.E.2d 385, 392 (W. Va. 1994)).

Plaintiff may only continue with his IIED claim if he shows that Defendant's conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

decency." *Id.* at 426 (quoting *Tanner v. Rite Aid of W. Va., Inc.*, 461 S.E.2d 149, 156-57 (W. Va. 1995)). This first element presents a high bar for a plaintiff to clear. *Bourne*, 998 F.Supp.2d at 507. A litigant cannot succeed upon an IIED claim by merely asserting conduct that was "annoying, harmful of one's rights or expectations, uncivil, [or] mean-spirited." *Courtney v. Courtney*, 413 S.E.2d 418, 423 (W. Va. 1991). For the claim to survive, there must be a genuine issue as to whether the conduct can "be regarded as atrocious, and utterly intolerable in a civilized community." *Travis*, 504 S.E.2d at 425. Whether Defendant's conduct satisfies the "outrageous" requirement is a question of law. In this case, Plaintiff has failed to demonstrate that Defendant's conduct met the high bar necessary to maintain the IIED claim.

In supporting his IIED claim, Plaintiff relies upon the same facts that he cited to support his WVCCPA claims. Certainly, conduct violative of the WVCCPA could also support an IIED claim. *Baldwin v. Wells Fargo Fin. Nat'l Bank*, No. 3:16-4841, 2017 WL 63026, at *2-3 (S.D.W. Va. Jan. 5, 2017) (Chambers, J.) (providing that separate WVCCPA and IIED claims may be based upon the same facts). However, in this case, the Court cannot find that Defendant's repeated and continuous calls constituted sufficiently "outrageous" conduct to permit Mr. O'Dell's IIED claim to continue. *See Casto v. Branch Banking and Tr. Co.*, No. 3:16-5848, 2017 WL 265586, at *12 n.11 (S.D.W. Va. Jan. 2, 2018) (Chambers, J.) (clarifying that although the Court found the evidence insufficient to support an IIED claim, the finding should not be construed to mean that conduct that violates the WVCCPA cannot also support an IIED claim).

West Virginia courts do not whimsically apply the legal standards for IIED. The West Virginia Supreme Court emphasizes that when inspecting the sufficiency of an IIED claim, the trial court must serve a "gate-keeping" role. *Philyaw v. E. Associated Coal Corp.*, 633 S.E.2d 8, 14 (W. Va. 2016). Tortious intent of an actor alone fails to carry an IIED claim. *Id.* Instead, the

conduct must be "so extreme and outrageous 'as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* (quoting *Tanner v. Rite Aid of W. Va.*, 461 S.E.2d 149, 156-57 (W. Va. 1995)).

Although Defendant's actions in this case may have reached the level of being annoying or uncivil, to describe the conduct as "utterly intolerable in a civilized community" exceeds the bounds of reason. Mr. O'Dell does not allege any aggressive or intolerable actions that surpassed "all possible bound of decency." Defendant called Mr. O'Dell many, many times. Those calls took place after Mr. O'Dell had asked Defendant to stop. Indeed, Defendant may have even made those calls unlawfully. However, without any other evidence, the Court does not believe Mr. O'Dell has demonstrated activity that can support an IIED claim.

For example, Mr. O'Dell has not produced any evidence that Defendant used offensive or threatening language. With regard to the vast majority of calls, Mr. O'Dell did not answer. As such, he cannot show that Defendant used language that would compel this Court to find that Defendant's conduct was sufficiently outrageous to maintain his IIED claim. So too, Mr. O'Dell never reported that Defendant's representatives used offensive language in the calls that he did answer, prior to giving Defendant notification about his attorney. Where the record is devoid of evidence supporting "atrocious" behavior, the Court finds that Defendant's conduct cannot reasonably be considered outrageous. Accordingly, Mr. O'Dell's IIED claim fails.

### c. Count III: Common Law Invasion of Privacy Claim

In his final count, Mr. O'Dell claims that Defendant violated his common law right to privacy. *Compl.*, at ¶ 18-22. Although unclear from his complaint, in his Response to Defendant's Motion for Summary Judgment, Plaintiff argues that Defendant violated this right in two ways.

*Pl.'s Resp.*, at 12-14.[8]  The record, however, fails to support either of Plaintiff's invasion of privacy

theories.

West Virginia courts recognize that an individual has a protectable right to privacy. *Crump*

*v. Beckley Newspapers, Inc.*, 320 S.E.2d 70, 84 (W. Va. 1983). The law provides four theories

under which a plaintiff can prosecute an invasion of privacy claim:

> (1) an unreasonable intrusion upon the seclusion of another; (2) an
> appropriation of another's name or likeness; (3) unreasonable
> publicity given to another's private life; and (4) publicity that
> unreasonably places another in a false light before the public.

*Id.* at 85 (citing Restatement (Second) of Torts §§ 652A-652E (1977)). Mr. O'Dell claims that

Defendant violated his common law right to privacy through both unreasonable intrusion, and

unreasonable publicity. Therefore, the Court will review the sufficiency of Plaintiff's production

with regard to both of those contentions.

Attending to the first, Mr. O'Dell contends that Defendant unreasonably intruded upon his

seclusion by repeatedly and continuously calling him. *Pl.'s Resp.*, at 12-13. In order to maintain

this claim, Mr. O'Dell must demonstrate that Defendant "intentionally intrude[d], physically or

otherwise, upon the solitude or seclusion of another or his private affairs or concerns, . . . [and

that] the intrusion would be highly offensive to a reasonable person." *Harbolt v. Steel of West*

*Virginia, Inc.*, 640 F.Supp.2d 803, 817 (S.D.W. Va. 2009) (Chambers, J.) (internal quotation marks

omitted) (quoting Restatement (Second) of Torts § 652B). Courts in this District have consistently

instructed that repeated, persistent calling can substantiate an invasion of privacy claim. *See*

---

[8] In its Reply, Defendant argues that Plaintiff first mentioned the common law invasion of
privacy by publicity in his Response. *Def.'s Reply*, at 14-15. Defendant claims Plaintiff
inappropriately raised this rationale for his invasion of common law right to privacy claim. *Id.*
However, since the Court finds that both of Plaintiff's invasion of privacy theories fail, the Court
need not address Defendant's objection.

*Imagine Medispa, LLC v. Transformations, Inc.*, 999 F.Supp.2d 873, 886 (S.D.W. Va. 2014) (citing cases in this District); *see also Huffman*, 2017 WL 2177351, at *7-8. In order to survive summary judgment on an invasion of privacy claim premised upon calls, a plaintiff must "offer evidence that the phone calls were made within a short time frame or that they were placed at inappropriate hours." *Adams v. Chrysler Fin. Co., LLC*, No. 5:11-cv-914, 2013 WL 1385407, at *9 (S.D.W. Va. Apr. 3, 2013) (Berger, J.). Although Plaintiff has produced evidence of multiple calls a day, the Court does not believe that Defendant's actions constitute activity that is *highly* offensive to a reasonable person.

Plaintiff focuses upon his call log to support his allegations of unreasonable intrusion. That log does reflect that Defendant once called Plaintiff five times in a single day. *Ex. 2 to Pl's. Resp.* However, Defendant did not reach that number of calls on any other day. So too, the log reflects that those five calls were not immediately following each other. Instead, the calls were spaced out over the span of a day. *Id.* at 44-45. And, even though the log had a space for Mr. O'Dell to record "[b]ad things they said," he did not report that Defendant's representative(s) said anything "bad" throughout the four months of calls. Upon this record, the Court cannot find that Defendant's conduct could be considered *highly* offensive to a reasonable person.

The Court certainly recognizes that a reasonable person could consider Defendant's conduct to be offensive. But to maintain his invasion of privacy claim upon an unreasonable intrusion, Mr. O'Dell must show that the calls had become "a substantial burden to his existence." *Imagine Medispa, LLC*, 999 F.Supp.2d at 886 (parenthetically quoting Restatement (Second) of Torts § 652B cmt. d). The calls were many and often. However, the constraints of rationality do not permit a finding that Defendant's calls substantially burdened Mr. O'Dell's existence. Therefore, Mr. O'Dell's unreasonable intrusion theory for his invasion of privacy claim cannot

continue past summary judgment. The Court finds Plaintiff failed to produce sufficient evidence to permit the reasonable juror to find Defendant's conduct "highly offensive."

Turning to Mr. O'Dell's second invasion of privacy argument, he claims that Defendant unreasonably publicized his personal life to others. *Pl.'s Resp.*, 13-14. Plaintiff contends that by calling his work place and leaving messages with his co-workers, Defendant unreasonably publicized his personal life. *Id.*

Although the record reflects that Defendant called Mr. O'Dell's work and left a message with his co-workers, the record lacks any indication of what Defendant's representative conveyed in that message. During his deposition, Mr. O'Dell testified that a school secretary reported to him "that USAA had called." *Ex. 2 to Pl.'s Resp.*, 10. Mr. O'Dell's testimony does not provide any insight into the content of the message beyond that USAA had called for him. In order to show that Defendant unreasonably publicized his personal life by leaving those messages, he must, at the very least, produce evidence that Defendant communicated some information about his personal life. Merely asking a third party to let Mr. O'Dell know that Defendant had called for him reveals nothing personal. There is no indication in the record that Defendant's representative told the school secretary that Mr. O'Dell owed money, had defaulted, or any other personal information within that realm. Without adequate evidentiary support, Plaintiff's claim for invasion of privacy due to unreasonable publicity also falls short. With both theories extinguished, the Court finds that Plaintiff has failed to adequately support his claim for common law invasion of privacy.

IV.    **Conclusion**

Consistent with the analysis and explanation above, the Court **GRANTS**, **IN PART**, and **DENIES**, **IN PART** Defendant's Motion for Summary Judgment (ECF No. 23). Specifically, the Court **GRANTS** the Motion for Summary Judgment with regard to Counts II (IIED claim) and III

(Common Law Invasion of Privacy claim) of Plaintiff's Complaint. However, the Court **DENIES** Defendant's Motion for Summary Judgment with regard to Count I (WVCCPA claims).

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:    April 5, 2018

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE